Gregory and Shannon **BROOME**,
Plaintiffs–Counterclaim
Defendants,

v.

Nicholas **BIONDI**, Richard Appleby, Katherine Cundey, Michael Silverman, Michael Weiner, and Beekman Hill House Apt. Corporation, Defendants–Counterclaim Plaintiffs.

Nicholas **BIONDI**, Richard Appleby, Katherine Cundey, Michael Silverman, Lawrence Weiner, and Beekman Hill House Apt. Corporation, Third–Party Plaintiffs,

v.

Simone **DEMOU**, Third–Party Defendant.

Nicholas **BIONDI**, Plaintiff,

v.

Simone **DEMOU**, Defendant.

Nos. 96 Civ. 0805(RLC),
96 Civ. 2262(RLC).

United States District Court,
S.D. New York.

Nov. 4, 1997.

---

Skadden, Arps, Slate, Meagher & Flom LLP, New York City (Scott D. Musoff, Joseph N. Sacca, Mark W. Smith, of counsel), for Plaintiffs.

Epstein, Becker & Green, P.C., New York City (Ronald M. Green, Patricia A. Murphy, Claudia M. Cohen, of counsel), for Defendants.

Latham & Watkins, New York City (Michael K. Hertz, John T. Brennan, Eric A. Richardson, of counsel), for Third–Party Defendant in No. 96 Civ. 0805, Defendant in No. 96 Civ. 2262.

## *OPINION*

ROBERT L. CARTER, District Judge.

Following a verdict in favor of plaintiffs Gregory and Shannon Broome ("the Broomes") and third-party defendant Simone Demou ("Demou") on various federal, state, and common law claims, the defendants/third-party plaintiffs ("the Beekman defendants") move for judgment as a matter of law, pursuant to Rule 50, F.R. Civ. P.; new trial, pursuant to Rule 59, F.R. Civ. P.; or, in the alternative, remittitur.

### I. Background

This case arose from the Beekman defendants' rejection of the Broomes' application to sublet apartment 7A at the Beekman Hill House, a cooperative apartment building located at 425 East 51st Street in New York City. On February 2, 1996, the Broomes commenced this action against the Beekman defendants, including the Beekman Hill House Apartment Corporation and every member of the Beekman Board of Directors in their individual and official capacities.[1] The Broomes filed claims for racial discrimination and civil rights violations under the Federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.;* 42 U.S.C. § 1981; 42 U.S.C. § 1982, the New York Human Rights Law, N.Y. Exec. L.

§ 296(5), and for intentional infliction of emotional distress under common law. The Beekman defendants counterclaimed against the Broomes for defamation.

Demou was a shareholder of the Beekman Hill House Apartment Corporation and the lessee of apartment 7A at the time when the Broomes' application was considered. Demou became involved in this litigation on January 30, 1996, when Nicholas Biondi, president of the Beekman Board of Directors, sued her in New York State Supreme Court for defamation, and on March 26, 1996, when the Beekman defendants brought a third-party action against Demou in this court alleging injurious falsehood based on statements made by Demou to the Broomes. Demou removed Nicholas Biondi's defamation claim to the court on March 29, 1996, and counterclaimed against the Beekman defendants claiming that their rejection of the Broomes' application, issuance of a Notice of Default, and filing of two lawsuits constituted retaliation against her for supporting the Broomes' application. Demou filed her retaliation counterclaims under the Federal Fair Housing Act, 42 U.S.C. § 3617; the New York Human Rights Law, N.Y. Exec. Law §§ 296(5), (7); and the New York City Administrative Code §§ 8–107(5), (7). Demou also asserted counterclaims for breach of fiduciary duty, breach of contract, and tortious interference with the performance of a contract.

On April 23, 1997, the case went to trial before a jury. At the close of evidence at trial, the court dismissed the claims for defamation, injurious falsehood, retaliation under the New York City Administrative Code, and breach of contract against the individual Beekman defendants. (Tr. at 995–1000, 1021)[2]. On May 6, 1997, after a seven-day jury trial and one day of deliberations, the jury returned a verdict. The jury awarded the Broomes $230,000 in compensatory damages and $410,000 in punitive damages on their discrimination claims under the Federal Fair Housing Act, 42 U.S.C. §§ 1981 and

1. The individual Beekman Board of Directors include Nicholas Biondi, Richard Appleby, Katherine Cundey, Michael Silverman, and Lawrence Weiner.

2. Cites to "Tr." refer to the Trial Transcript.

1982, and the New York Human Rights Law § 296(5).[3] The Beekman defendants were found not liable on the Broomes' state law claim for intentional infliction of emotional distress. Demou was awarded $100,000 in compensatory damages and $47,000 in punitive damages on her Federal Fair Housing Act and New York Human Rights Law retaliation claims; $5,000 in compensatory damages on her breach of contract claim, $1,000 in compensatory damages and $5,000 in punitive damages on her breach of fiduciary claim; and $1,000 in compensatory damages and $5,000 in punitive damages on her claim for tortious interference with the performance of a contract.[4]

## II. Judgment as a Matter of Law

The Beekman defendants move for judgment as a matter of law, pursuant to Rule 50, F.R. Civ. P., with respect to the Broomes' discrimination claims and all of Demou's claims that were presented to the jury. A motion for judgment as a matter of law, pursuant to Rule 50(b), F.R. Civ. P., may be granted when " '(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.' " *Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir.1984) (quoting *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980)); *Nembhard v. Memorial Sloan–Kettering Cancer Ctr.*, 918 F.Supp. 784, 788 (S.D.N.Y.) (Chin, J.), *aff'd*, 104 F.3d 353, 1996 WL 680756 (2d Cir.1996). In considering the Rule 50(b) motion, "[t]he district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence."

*Maguire Co., Inc. v. Herbert Constr. Co.*, 945 F.Supp. 72, 74 (S.D.N.Y.1996) (Carter, J.). " '[T]he trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.' " *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987) (quoting *Mattivi*, 618 F.2d at 167–68).

### A. The Broomes' Claims

■ The Broomes asserted discrimination claims against the Beekman defendants under the Federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; 42 U.S.C. §§ 1981 and 1982; and the New York Human Rights Law, N.Y. Exec. L. § 296(5). Each of these laws required the Broomes to make a prima facie case of housing discrimination. *See Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir.), *cert. denied*, 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994); *Leslie v. BancTec Serv. Corp.*, 928 F.Supp. 341, 350 (S.D.N.Y.1996) (Batts, J.). In order to establish a prima facie case of housing discrimination, a plaintiff must show that: (1) he is a member of the class protected by the statute, (2) he applied for and was qualified to rent the housing, (3) he was denied the opportunity to rent the housing, and (4) the housing opportunity remained available thereafter. *See Cabrera*, 24 F.3d at 381.

■ The Beekman defendants maintain that they are entitled to judgment as a matter of law on the discrimination claims because the Broomes did not show that they were qualified to sublet the apartment in question. Specifically, the Beekman defendants argue that the Broomes failed to prove that they could "live peacefully and harmoniously with other members of the Beekman Hill House 'community.' " (Defs.' Mem. of Law at 12–13). In this circuit, however, the Broomes need not make this showing to es-

---

**3.** Specifically, the jury found liability against the Beekman Hill House Apartment Corporation, all Board of Directors in their official capacities, and Nicholas Biondi and Richard Appleby in their personal capacities.

**4.** Specifically, the jury found liability against the Beekman Hill House Apartment Corporation, all Board of Directors in their official capacities,

and Nicholas Biondi in his personal capacity, for the Federal Fair Housing Act, New York Human Rights Law, and tortious interference with a contract claims. The Beekman Hill House Corporation was also found liable for the breach of contract claim, and all Board of Directors, in their official capacities, for the breach of fiduciary duty claim.

tablish that they are qualified subtenants. The courts have found a plaintiff to be "qualified" for housing if he is financially able to rent or buy such housing. *See, e.g. Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir.1979) (affirming the district court's finding that plaintiff was qualified because "he could afford to purchase the space sought"); *Jiminez v. Southridge Co-op., Sec. I, Inc.*, 626 F.Supp. 732, 734–35 (E.D.N.Y. 1985) (holding that plaintiff was not qualified to purchase the apartment because he did not show that he had sufficient cash or assets to cover the purchase price of the apartment and did not have a stable job); *see also Crawford v. Metropolitan Impex, Inc.*, No. 84 Civ. 3495, 1985 WL 3043, at *4, n. 1 (S.D.N.Y. Oct.7, 1985) (Conner, J.), *aff'd*, 800 F.2d 1127 (2d Cir.), *cert. denied*, 476 U.S. 1174, 106 S.Ct. 2901, 90 L.Ed.2d 987 (1986). The record contains evidence from which the jury could rationally conclude that the Broomes were qualified to sublease apartment 7A. At trial, the Beekman defendants stated that the Broomes "[e]ach earn[ed] a great deal of money" and conceded that "as far as financially, they would make excellent tenants." (Tr. at 438, 1068). Therefore, the court finds that the jury's verdict must be sustained on this issue.

■ The Beekman defendants also assert that the Broomes did not prove their discrimination claims because they did not show proof of circumstances giving rise to an inference of discrimination as part of their prima facie case. (Defs.' Mem. of Law at 13). In this circuit, a housing discrimination plaintiff raises an inference of discrimination when he establishes a prima facie case. *See United States v. Town Hall Terrace Assoc.*, No. 95–CV–0533E(H), 1997 WL 128353, at *3 (W.D.N.Y. Mar.14, 1997). The proof shows that the Broomes are members of a protected class, they were qualified to sublease apartment 7A, their sublease application was denied, and the apartment remained available thereafter. (Tr. at 438, 790–91, 1068). Nothing more need be shown to establish a prima facie case. *See Soules v. United States Dept. of Hous. & Urban Dev.*, 967 F.2d 817, 822 (2d Cir.1992). Therefore, the court finds that the Broomes did show an inference of housing discrimination.

■ At trial, the Beekman defendants had the burden of rebutting any inference of housing discrimination by proffering a legitimate, nondiscriminatory reason for their actions. *See id.* at 822. The Beekman defendants explained that they rejected the Broomes' application because "they perceived them as confrontational and litigious," and believed Demou was trying to intimidate them into accepting the Broomes as subtenants by raising charges of racism. (Defs.' Mem. of Law at 14–15). Once a defendant articulates a reason for his actions, the burden shifts to plaintiff to demonstrate that the articulated reason was a pretext for housing discrimination. *See Soules*, 967 F.2d at 822. The Beekman defendants claim that the Broomes did not present any evidence of race discrimination or establish that their proffered reasons for rejecting the sublease application were pretextual. (Defs.' Mem. of Law at 14).

■ "[T]o determine whether [a defendant's] putative purpose is a pretext, a factfinder need not, and indeed should not evaluate whether a defendant's stated purpose is unwise or unreasonable." *DeMarco v. Holy Cross High School*, 4 F.3d 166, 170–71 (2d Cir.1993). Rather, the decision should be based on whether the proffered reason is the actual reason for the challenged action. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988). The court finds that the trial record contains evidence from which the jury could reasonably conclude that the Beekman defendants' articulated reasons for rejecting the Broomes' sublet application were pretextual and that the decision was actually based on Gregory Broome's race. Contrary to the Beekman defendants' assertions, the Broomes testified that they did not threaten to sue the Board or any of its members. (*See* Tr. at 83, 183–84). At trial, the Broomes also stated that they submitted references from former landlords and employers as part of their sublet application and that none of the Board members checked any of these references to ask about the Broomes and their potential to be good tenants. (*See* Tr. at 64–65, 178). Demou testified that she called each Board member to

advocate for the Broomes' application because she believed they were qualified, and discussed the issue of race with each defendant because she had reason to suspect that the Broomes were being treated differently from former subtenants because of race. (*See* Tr. at 747–49, 752). At trial, Demou described past incidents in which she believed Biondi acted in a racially prejudiced manner, and stated that she suspected race was a factor in considering the Broomes' sublet application because Biondi was in charge of the approval process. (*See* Tr. at 744, 761–62, 766–70, 812).

The record also shows that the Beekman Board members discussed Gregory Broome's race when reviewing his application. Following his meeting with Gregory Broome, Biondi mentioned to Weiner that Broome was a black man. Weiner wrote Broome's race at the top of his notes concerning the Broome application, and told Demou that he "felt better" about the Broomes' application upon learning that Shannon Broome was white. (Tr. at 254–55, 261). The evidence also indicates that after meeting Gregory Broome, Biondi told Silverman that he felt "uneasy," and that Silverman "said to Mr. Biondi that if you feel uneasy because Mr. Broome is black, we will be sued." (Tr. at 227). The record shows that Appleby introduced the issue of race at the June 13 interview by "rudely" asking the Broomes if they were going to sue and whether they thought they had been racially discriminated against in the application process.[5] (*See* Tr. at 84–86, 380, 385). Cundey's trial testimony also shows that she

voted to reject the Broomes' application because she believed that the Broomes would sue based on race discrimination whenever they encountered any problem as tenants in the building. (*See* Tr. at 370–71, 521). Considering this evidence in the light most favorable to the plaintiffs, the motion for judgment as a matter of law regarding the Broomes' discrimination claims must be denied.

### B. *Demou's Counterclaims*

Demou asserted counterclaims against the Beekman defendants for retaliation under the Federal Fair Housing Act and the New York Human Rights law, breach of fiduciary duty, breach of contract, and tortious interference with the performance of a contract. The Beekman defendants contend that they are entitled to judgment as a matter of law on these counterclaims because there was no rational basis upon which a jury could have reasonably found for her on any of them.

### 1. *Retaliation Counterclaims*

■ Demou counterclaimed that the Beekman defendants retaliated against her, for supporting the Broomes' sublet application, by rejecting the sublease, issuing a Notice of Default, and filing two lawsuits. Under the Federal Fair Housing Act and the New York Human Rights Law, Demou was required to make a prima facie case of retaliation by showing that (1) she engaged in protected activity by opposing conduct prohibited under each of these laws, (2) the Beekman

5. In a supplemental memorandum of law, Appleby argues that he is entitled to judgment as a matter of law on the jury's finding that he is personally liable to the Broomes for racial discrimination. (*See* Appleby's Supp. Mem. of Law, at 1–2). The court finds, however, that the record contains proof from which the jury could reach this conclusion. At trial, Appleby testified that he felt "race was in the air" at the June 13 interview "[s]imply because of the fact that Gregory Broome's of an interracial couple and that he's black and he felt jerked around." (Tr. at 392). As stated above, Appleby asked the Broomes whether they felt that they were being treated in a racially discriminatory manner, and whether they had threatened to sue the Board. (*See* Tr. at 182–87, 385). The Broomes testified that this questioning was done in an aggressive and hostile manner. (*See* Tr. at 182–87). The

evidence also shows that Appleby asked Herbert Cohen, the Board's attorney, to leave the room during this questioning. (*See* Tr. at 604–05). Appleby stated that he thought sublet applicants should be interviewed by the Board because it is "very important to actually eyeball the actual person who is living in the apartment." (Tr. at 380). In his explanation of why it was important to view applicants, Appleby suggested that he would vote to reject an applicant based on his appearance: "Let's say the mate, the spouse has got severe disabilities, and, under the American Disabilities Acts [sic] you might have to, you know, spend a lot of money to facilitate under the law this handicapped person." (Tr. at 381). Viewing this evidence in the light most favorable to the Broomes, Appleby's motion for judgment as a matter of law must be denied.

defendants were aware of that activity, (3) she was subject to an adverse action, and (4) there was a causal connection between the protected activity and the adverse action. *See Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

■ The Beekman defendants argue that they are entitled to judgment as a matter of law because Demou failed to establish a prima facie case of retaliation. Specifically, the Beekman defendants claim that Demou failed to demonstrate that she engaged in a protected activity. (Defs.' Mem. of Law at 21). To prove that she engaged in protected activity, Demou had to show that she took action to affirmatively oppose discrimination against the plaintiffs by the Beekman defendants. *See Manoharan*, 842 F.2d at 593. Demou did not have to establish that the conduct she opposed was in fact a violation of the Federal Fair Housing Act and the New York Human Rights Law, but only that she had a "good faith, reasonable belief that the underlying actions of the [Beekman defendants] violated the law." *Abel v. Bonfanti*, 625 F.Supp. 263, 267 (S.D.N.Y.1985) (Sweet, J.).

■ Demou testified that she reasonably believed the Board's actions toward the Broomes were motivated by racial prejudice. (*See* Tr. at 750). Demou presented evidence showing that she developed this perception because Nicholas Biondi and the Board treated the Broomes differently from former sublet applicants. (*See* Tr. at 741, 747, 749). Demou first spoke with Biondi about the Broomes' application on May 31 or June 1, and told him about their financial qualifications. (*See* Tr. at 743). Demou testified that Biondi said he would meet with Gregory Broome and that no full Board meeting would be required because the Board would go along with his decision concerning the application. (*See* Tr. at 744). After meeting with Gregory Broome on June 5, however, the record shows that the Broomes were required to meet with the full Board on the following evening. (*See* Tr. at 747). Demou testified that she became concerned about the requirement of a second meeting because this was an unprecedented requirement for the approval process, and she reasonably believed that this change was made based on race because the Broomes were otherwise qualified applicants. (*See* Tr. at 747–49, 752).

The evidence also demonstrates that Demou took affirmative action to oppose what she believed to be the Beekman defendants' attempt to frustrate the Broomes' sublet application because of Gregory Broome's race. Demou testified that she encouraged the Broomes to follow through the Board's approval process; spoke with Eddie Vega, the superintendent, to facilitate the Broomes' move into the apartment; tried to call Biondi and visited Maria Capraro at American Landmark to find out why a second Board meeting was required; and called each Board of Director to ask them to approve the Broomes' sublet application. (*See* Tr. at 238–39, 305–07, 448–51, 746–48, 752, 755, 758). Based on this evidence, the court finds that the jury could conclude that the "protected activity" requirement of her retaliation claims was satisfied and, therefore, that she made a prima facie case of retaliation.

■ At trial, the Beekman defendants rebutted Demou's prima facie showing of retaliation by providing a legitimate, nondiscriminatory reason for their rejection of the Broomes' sublease application. The Beekman defendants argue that they are entitled to judgment as a matter of law on Demou's retaliation claims because she failed to show that these reasons were a pretext for a racially discriminatory motive. (Defs.' Mem. of Law at 24–26). The trial record shows, however, that the jury could reasonably decide that the Broomes' sublet application was denied because of Gregory Broome's race. *See* Section II.A., *supra*. Therefore, the Beekman defendants' motion for judgment as a matter of law with respect to Demou's retaliation claims is denied.

### 2. *Breach of Fiduciary Duty Counterclaim*

■ The Beekman defendants ask the court to set aside the jury's verdict for Demou on the breach of fiduciary duty counterclaim. The directors of a corporation, such as Beekman Hill House Apartment Corporation, owe the shareholders of the corporation a fiduciary duty. *See Bernheim v. 136 East*

*64th Street Corp.*, 128 A.D.2d 434, 512 N.Y.S.2d 825, 826 (N.Y.App.Div.1987). Under New York law, the fiduciary duty of a director of a corporation toward a shareholder is the obligation to perform his duties in good faith, without discriminatory practice, and with the degree of care which an ordinary prudent person in a like position would use under similar circumstances. *See id.* Demou asserted a breach of fiduciary duty counterclaim against the individual Beekman Board members for unreasonably denying approval of the Broomes' application to sublet her apartment and for issuing a Notice of Default against her. As a shareholder, Demou had the burden of showing that the Board made these determinations in bad faith and with a purpose that was not in the best interests of all the people they represented. *See Levandusky v. One Fifth Ave. Apartment Corp.*, 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317 (N.Y.App.Div. 1990); *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986).

■ Demou presented evidence upon which the jury could reasonably conclude that the Beekman Board members breached their fiduciary duty to her as a shareholder. As previously discussed, the record contains proof from which the jury could find that the Beekman Board members acted upon the Broomes' sublet application with discrimination and, issued the Notice of Default as a form of retaliation against Demou for trying to oppose the Board's actions. *See* Section II.A. & Subsection II.B.1., *supra.* For these same reasons, the court concludes that the jury could reasonably find that the Beekman Board members acted in bad faith and with a purpose that was not in the best interests of the cooperative. Thus, the Beekman defendants' motion for judgment as a matter of law on the breach of fiduciary duty counterclaim is denied.

### 3. *Breach of Contract Counterclaim*

Demou counterclaimed that the Beekman Hill House Apartment Cooperative breached the "Proprietary Lease," a contract it entered into with her, when the Board rejected the Broomes' sublet application. The Beekman defendants move for judgment as a matter of law on this counterclaim. Specifically, they contend that the Proprietary Lease was not breached because the denial of the Broomes' sublet application was reasonable given "Demou's reprehensible and objectionable conduct between June 6 and 13, 1995, ... the Broomes' perceived hostile and litigious attitude birthed and cultivated by Demou, and the threat to sue the building." (Defs.' Mem. of Law at 29–30).

■ In order to prove her breach of contract claim, Demou had to prove the following elements: (1) that she had a contract with the Beekman Hill House Apartment Cooperative concerning subleases; (2) that the contract obligated the Cooperative to not unreasonably withhold consent for subleases; (3) that the Cooperative unreasonably withheld approval of a qualified sublessee; and (4) that she suffered economic damage as a direct result of the Cooperative unreasonably withholding approval of a sublessee. *See Stephens v. American Home Assurance Co.*, 811 F.Supp. 937, 958 (S.D.N.Y.1993) (Martin, J.), *vacated and remanded*, 70 F.3d 10 (2d Cir.1995); *Van Brunt, III v. Rauschenberg*, 799 F.Supp. 1467, 1470 (S.D.N.Y.1992) (Martin, J.). A rational jury could find that Demou proved the elements for breach of contract at trial. The record shows that Demou signed a Proprietary Lease with the Beekman Hill House Apartment Cooperative in 1986, and that this contract contained a provision providing that "[a]ny consent to subletting may not be unreasonably withheld ...." Proprietary Lease, ¶ 15, Defs.' Exh. B; (*see* Tr. at 730). Based on the trial evidence, the jury could find that the Beekman Board unreasonably withheld its approval of the Broomes' sublet application because of Gregory Broome's race. *See* Section II.A., *supra.* Moreover, the jury heard Demou's testimony that she suffered economic damages as a result of the Board's denial of the Broomes' sublet application because her apartment remained vacant for ten months thereafter. (*See* Tr. at 802–04).

### 4. *Tortious Interference with Contract Counterclaim*

■ Demou counterclaimed that the Beekman defendants tortiously interfered

with the performance of the sublease agreement that she made with the Broomes. The Beekman defendants assert that they are entitled to judgment as a matter of law on this counterclaim because Demou did not show each element of this cause of action at trial. (Defs.' Mem. of Law at 14–16). To recover on this counterclaim, Demou had to prove the following elements: (1) that she had a valid and existing contract with the Broomes; (2) that the Beekman defendants had knowledge of the existence of the contract; (3) that the Beekman defendants intentionally interfered with the performance of the contract; (4) that the Beekman defendants had no justification or privilege for their actions; (5) that the Beekman defendants' conduct resulted in the disruption of the performance of the agreement between her and the Broomes; and (6) that she suffered money damages caused by the Beekman defendants' interference with performance of the contract. *See Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996).

█ The Beekman defendants contend that Demou's counterclaim for tortious interference with the performance of a contract fails because she did not show that a valid contract existed between her and the Broomes. (Defs.' Mem. of Law at 31). Specifically, the Beekman defendants argue that any sublet contract between Demou and the Broomes was not legally enforceable because the Proprietary Lease provides that a lessee cannot sublet an apartment without consent from the Board of Directors. (*See* Proprietary Lease, ¶ 15, Defs.' Exh. B). The evidence shows, however, that the Broomes formed a contract with Demou when both parties signed the sublease agreement on May 30, 1995. (*See* Residential Lease Agreement, at Aff. of Eric Richardson, Exh. E; *see also* Tr. at 53, 826). Therefore, the court reads the Proprietary Lease as only requiring the Board of Directors' approval to perform the sublet contract.

█ The Beekman defendants also state that they cannot be found liable for tortious interference with the sublease contract because they had a legitimate interest in the sublease and, therefore, a justification or privilege for interfering with the contract. (Defs.' Mem. of Law at 31–33). As directors of the cooperative corporation, the Beekman defendants each had a financial interest in Demou's sublease agreement with the Broomes, and had a right to review such agreements. (*See* Proprietary Lease, at ¶ 15, Defs. Exh. B). Under New York law, "a person who has a financial interest ... in the business of another is privileged to interfere with a contract which that other person or business had with a third person if his purpose is to protect his own interest and if he does not employ improper means." *Felsen v. Sol Cafe Mfg. Corp., et al.,* 24 N.Y.2d 682, 301 N.Y.S.2d 610, 613, 249 N.E.2d 459 (N.Y.), *reargument denied,* 25 N.Y.2d 896, 304 N.Y.S.2d 1031, 251 N.E.2d 152 (N.Y.1969). In order to show that the Beekman defendants were not privileged to interfere with the sublease, Demou had to prove that the Beekman defendants used unlawful means to protect their interests or that they acted to cause harm to Demou rather than to preserve their economic or business interests. *See id.* The trial record shows that the jury could rationally find that the Beekman defendants' unlawfully interfered with the sublease contract because of Gregory Broome's race, and as a means of retaliating against Demou for trying to oppose the Board's actions. *See* Section II.A. & Subsection II.B.1., *supra.* Based on this proof, the court concludes that the jury could decide that the Beekman defendants had no justification or privilege for interfering with the sublet contract. Therefore, the jury's verdict on her tortious interference with a contract counterclaim must stand.

### III. New Trial

#### A. *Weight of the Evidence*

The Beekman defendants assert that they are entitled to a new trial, pursuant to Rule 59, F.R. Civ. P., because the jury's verdict was against the weight of the evidence. (Defs.' Mem. of Law at 7). Rule 59(a), F.R. Civ. P. provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore

been granted in actions at law in the courts of the United States." "The district court's grant of a new trial motion is usually warranted only if it 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 875 (2d Cir.1992) (quoting *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988)). As the preceding discussion makes clear, the jury's verdict on liability was supported by a fair interpretation of the evidence. *See* Part II, *supra.* As such, the court cannot find that the verdict on liability is a miscarriage of justice, and, therefore, the motion for a new trial must be denied. *See Bevevino v. Saydjari*, 574 F.2d 676, 683 (2d Cir.1978).

### B. *Character Testimony*

█ In a supplemental memorandum of law, Richard Appleby asserts that he is entitled to a new trial on the issue of his personal liability to the Broomes for racial discrimination.[6] Specifically, Appleby argues that the court improperly excluded, by an order *in limine*, the testimony of three witnesses who would have testified that he is not racially prejudiced. (Appleby's Supp. Mem. of Law at 10–14). Rule 61, F.R. Civ. P. provides that "[n]o error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Datskow v. Teledyne Continental Motors Aircraft Products, a Div. of Teledyne Indus., Inc.*, 826 F.Supp. 677, 684 (W.D.N.Y. 1993) (citing Rule 61, F.R. Civ. P.). The court is not persuaded by Appleby's claim of

error, and finds that the exclusion of his character testimony does not appear to be "inconsistent with substantial justice."

Under Rule 404(a), "[e]vidence of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Rule 404(a), F.R. Evid.[7] Appleby intended to introduce character testimony that he "routinely interacts with African Americans in a non-discriminatory manner." (Appleby's Mem. of Law at 13–14). The court excluded this testimony as an attempt to show action in conformity with character. (*See* Transcript of Preliminary Trial Matters, April 23, 1997, at 21–23). The court still maintains that the character evidence is not relevant because the testimony would only show that some people in Appleby's community believe that he generally does not act in a racially discriminatory way, and would make no indication about whether he behaved in a racially discriminatory manner toward the Broomes. *See Johnson v. Pistilli*, No. 95–C–6424, 1996 WL 587554, at *2 (N.D.Ill. October 8, 1996) (excluding the testimony of six proposed trial witnesses on this basis).

Appleby argues that the evidence was improperly excluded on this basis because he intended to use the testimony to show that he lacked the motive or intent necessary to commit an act of racial discrimination. (Appleby's Reply Mem. of Law at 10–11). The Broomes brought claims for discrimination under the Federal Fair Housing Act, section 296 of the New York Human Rights Law, and 42 U.S.C. §§ 1981 and 1982. Proof of discriminatory intent is an element for only the 42 U.S.C. §§ 1981 and 1982 claims. *See Soules v. United States Dept. of Housing & Urban Dev.*, 967 F.2d 817, 822 (2d Cir.1992); *Rogers v. 66–36 Yellowstone Blvd. Coop.*

---

6. The Beekman defendants also argue that they are entitled to a new trial because the jury erred when it found Biondi and Appleby liable in both their official and personal capacities. (Defs.' Mem. of Law, at 34 n. 8). As plaintiffs point out, however, this argument is not valid because courts routinely impose liability on corporate directors in their individual and official capacities. *See, e.g., Mathie v. Fries*, 935 F.Supp. 1284, 1307 (E.D.N.Y.1996), *aff'd*, 121 F.3d 808, 1997 WL 426567 (2d Cir. July 31, 1997) (finding defendant liable individually and in his former offi-

cial capacity for violation of plaintiff's rights under section 1983).

7. There are three exceptions to the rule that evidence of a person's character to show action in conformity with that character is inadmissible. *See* Rule 404(a), F.R. Evid. Two of these exceptions apply in criminal cases only and the third exception is inapplicable here because it concerns the impeachment of a witness. *See id.*

*Owners, Inc.,* 599 F.Supp. 79, 80 n. 2. (E.D.N.Y.1984). "[E]vidence of other acts may be admitted under Rule 404(b), F.R. Evid., to prove intent, subject to the limitation of Rule 403, F.R. Evid. to exclude evidence if the danger of its undue prejudice would outweigh its relevance." *Boykin v. Hamilton County Bd. of Ed.,* 869 F.2d 1488, 1989 WL 20570, *3 (6th Cir.1989). Under Rule 403, F.R. Evid., it was proper to exclude the character evidence because allowing the jury to consider such testimony for only the section 1981 and 1982 claims would have created confusion, and would have prejudiced the Broomes' claims for discrimination under the Federal Fair Housing Act and New York Human Rights Law. Therefore, Appleby's motion for a new trial is denied.

## IV. Remittitur

 In the alternative, the Beekman defendants seek remittitur of the jury verdict on the claim that the respective compensatory and punitive damages awarded to the Broomes and Demou are excessive and unsupported by the evidence adduced at trial. Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial" on damages. *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328 (2d Cir.1990) (quoting *Shu–Tao Lin v. Mc Donnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984)). A jury verdict is excessive "if it is so high as to 'shock the judicial conscience.'" *Schneider v. National R.R. Passenger Corp.,* 987 F.2d 132, 137 (2d Cir.1993) (quoting *Nairn v. National R.R. Passenger Corp.,* 837 F.2d 565, 567 (2d Cir.1988)). To determine whether an award of damages is shockingly excessive, the "court properly may look to the amount of damages awarded to other plaintiffs in cases involving comparable injuries." *Schramm v. Long Island R.R. Co.,* 857 F.Supp. 255, 258 (E.D.N.Y.1994). In viewing these similar cases, however, the court should "take into consideration plaintiff's particular injuries and the unique circumstances of this case." *Id.* Moreover, the court must grant substantial deference to the jury's finding of facts.

*See Taylor v. National R.R. Passenger Corp.,* 868 F.Supp. 479, 484 (E.D.N.Y.1994).

### A. Compensatory Damages

#### 1. The Broomes' Award

 The jury awarded the Broomes $230,000 in compensatory damages for emotional injury and economic loss they suffered as a result of the Beekman defendants' discriminatory conduct. At trial, the plaintiffs testified that they had been emotionally injured by the Beekman defendants' conduct. Shannon Broome stated that she felt embarrassed and humiliated by the entire approval process and the ultimate denial of their sublet application. (*See* Tr. at 190–91). She testified that she felt as if she were experiencing her "worst nightmare." (*See* Tr. at 177). Shannon Broome was reduced to tears during the June 13th Beekman board interview, and again upon hearing the news that their sublet application had been rejected. (*See* Tr. at 186, 189–190). She also testified that she was reluctant to tell her husband that the Beekman board rejected their application because she "knew how much it was going to upset him." (*See* Tr. at 189).

Gregory Broome testified that he felt "angry" and "demoralized" by the hostile manner in which he and his wife were treated at the June 13 interview and that "[i]t was difficult for [his] feelings to go away." (*See* Tr. at 89–90, 92–93). He described how he was especially humiliated that he had swallowed his pride and submitted to the board's interrogation during the June 13th interview without defending himself or his wife. (*See* Tr. at 89–90). Gregory Broome also stated that his confidence at work was affected by his "fear that clients would somehow not trust [his] advice after they met [him]." (*See* Tr. at 92). Each of the Broomes testified that they had to pass the Beekman Hill House every day to reach a park to walk their dog and were reminded constantly of their emotional pain caused by the board's actions. (*See* Tr. at 92, 191).

The Beekman defendants challenge whether the emotional distress award of approximately $114,000 [8] each to Gregory and Shan-

---

8. The evidence shows that the Broomes suffered approximately $2,000 in economic damages as a

result of the Beekman defendants' actions, arising from moving expenses ($180), broker's fee

non Broome was appropriate as compared to awards in similar cases and whether it was supported by evidence in the record. (Defs.' Mem. of Law at 36.) In particular, defendants urge the court to follow *Portee v. Hastava*, 853 F.Supp. 597 (E.D.N.Y.1994), *aff'd* 104 F.3d 349, 1996 WL 520981 (2d Cir.1996). (Defs' Mem. of Law at 41–42.) In *Portee*, a $280,000 jury award to an interracial couple and their son for compensatory damages was reduced on retrial to $101,000 to the wife, husband, and child in the sums of $33,000, $50,000, and $18,000, respectively. *See Portee v. Hastava*, 104 F.3d 349, 1996 WL 520981 (2d Cir.1996). Based on its review of employment and housing cases in which some form of discrimination resulted in emotional distress, the *Portee* court concluded that the original awards in that case were "far out of line [with those awards] that have been approved in similar cases" which have not exceeded $50,000. *Portee*, 853 F.Supp. at 613. In addition, the *Portee* court found that the original damage award bore "no rational relationship to the injuries proved at trial," and noted the plaintiffs' lack of medical records proving injury, plaintiffs' failure to directly connect any physical infirmity to the discriminatory act in question, and the lack of evidence of continuing emotional trauma and negatively-impacted work performance. *Id.*

The *Portee* court's canvassing of discrimination cases seems to be incomplete and its reasoning unclear. Other courts, moreover, *have* recognized the severe mental trauma associated with unlawful discrimination and have upheld large compensatory awards for the victims in such cases. For example, in *Walters v. City of Atlanta*, 803 F.2d 1135 (11th Cir.1986), the court upheld a $150,000 damages award for emotional distress caused by racial discrimination against a white man applying for a position as director of the city cyclorama. In *Moody v. Pepsi–Cola Metropolitan Bottling Co., Inc.*, 915 F.2d 201 (6th Cir.1990), the court held that an award of $150,000 in emotional distress damages for an employee who suffered age discrimination was not excessive despite sizable differences with verdicts in other cases. *See also Ra-*

*mirez v. New York City Off–Track Betting Corp.*, 112 F.3d 38 (2nd Cir.1997) (finding that award of $500,000 for emotional pain in employment discrimination case was not unconscionable); *New York City Transit Auth. v. State Div. of Human Rights*, 181 A.D.2d 891, 185 A.D.2d 889, 581 N.Y.S.2d 426, *appeal denied*, 80 N.Y.2d 762, 592 N.Y.S.2d 671, 607 N.E.2d 818 (N.Y.A.D. Nov.24, 1992) (upholding $450,000 compensatory damages award for sex discrimination); *119–121 East 97th Street Corp. v. New York City Commission on Human Rights*, 220 A.D.2d 79, 642 N.Y.S.2d 638 (1st Dep't 1996) (finding that evidence supported $100,000 award for mental anguish to a tenant with human immunodeficiency virus during period of harassment against him by landlord).

Furthermore, the *Portee* court's reliance on a dearth of tangible injury as a primary reason for reducing compensatory damages does not appear determinative and provides little guidance for evaluating the merits of compensatory damages based on a plaintiff's testimony. Indeed such reasoning appears to conflict with the prevailing view in this circuit which provides that "proof of mental anguish or emotional distress does not have to include medical testimony and it may consist of the plaintiff's testimony, alone, as corroborated by reference to the circumstances of the alleged misconduct." *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662, 666 (S.D.N.Y.1995) (Koeltl, J.); *see also Miner v. City of Glens Falls*, 999 F.2d 655, 663 (2d Cir.1993) ("[A] prescription for medicine or a visit to a doctor can lend support to a claim for emotional distress; however, such evidence is neither required nor necessarily probative . . . .").

Neither the *Portee* court, nor any other court cited by defendants indicates why $101,000 could be considered a "rational" damages award in a racial discrimination case while a $280,000 award is excessive. Simply attributing reduced damage awards to a plaintiff's lack of tangible harm has resulted in widely differentiated determinations. *See Douglas v. Metro Rental Services,*

---

($1,750), and the difference in value between Demou's two-bedroom apartment and the one-bedroom apartment that they moved into in-

stead. (*See* Tr. at 219–20). Therefore, the jury awarded plaintiffs approximately $228,000 total for emotional distress or mental anguish.

*Inc.*, 827 F.2d 252 (7th Cir.1987) (reducing compensatory damages to $2,500 a person because intangible injury could not justify individual awards of $10,000); *Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190 (7th Cir.1982) (reducing compensatory damages to $10,000 a person since plaintiffs testimony alone was inadequate basis for $25,000 award); *Darby v. Heather Ridge*, 827 F.Supp. 1296, 1300 (E.D.Mich.1993) (reducing an emotional damages award to a couple for housing discrimination from $187,160 to $37,160 for lack of tangible injury and to maintain alignment with other housing discrimination cases). Significantly, large awards have been upheld without signs of tangible harm or medical testimony. In *Walters*, for example, the $150,000 emotional distress award for the white male who prevailed in his racial discrimination claim was not supported by physical symptoms of emotional distress, expert testimony, or evidence of mental health treatment. *Walters*, 803 F.2d at 1146 & n. 8 (plaintiff testified to the "frustration and emotional 'wear and tear' surrounding his repeated attempts to obtain employment at the [cyclorama].") *See also New York City Police Department v. De-Leon*, 201 A.D.2d 260, 608 N.Y.S.2d 827, *lv. denied* 83 N.Y.2d 757, 615 N.Y.S.2d 874, 639 N.E.2d 415 (1st Dep't 1994) (holding that complainant's testimony as to the retaliation she was subjected to was sufficient to support a mental anguish award of $250,000 without any medical evidence).

The large variation in compensatory awards underscores the Second Circuit's observation that courts determining emotional damages must make "wholly speculative judgments as to credibility, to separate the genuine from the baseless." *Ragin v. New York Times Co.*, 923 F.2d 995, 1005 (2nd Cir.1991). Therefore, in the midst of these seemingly capricious determinations, the court must rely primarily on case-specific facts relating to the severity of the discriminatory behavior and duration of the resulting emotional damage. In that regard, the court finds that the plaintiffs in this case were credible and the evidence presented was persuasive.

Recognizing that the majority of cases supporting the Broomes' emotional damages award involve employment discrimination, defendants argue that comparing award damages between employment and housing discrimination cases is improper. According to defendants, employment discrimination cases "by their nature require larger awards [than housing discrimination cases]" because employment discrimination tends to occur over months and years while housing discrimination usually lasts days or weeks. (Defs.' Mem. of Law at 21). However, defendants offer no proof supporting this contention. Indeed, the trial record supports a contrary conclusion since the Broomes testified to a recurrent pain when in the vicinity of the Beekman Hill House Apartments even two years after the 1995 incident in question. (Tr. at 91, 192).

Moreover, the court's decision in *Portee*, the case upon which defendants primarily rely for arguing excessive damages, itself was based upon a review of all types of cases involving mental anguish arising from discrimination, including employment discrimination. *See Portee*, 853 F.Supp. at 613–615 (citing *Miner v. City of Glens Falls*, 999 F.2d 655 (2d Cir.1993) (granting mental distress award to police officer who was denied due process and forced to retire); *Butcher v. City of McAlester*, 956 F.2d 973 (10th Cir.1992) (granting firefighters emotional damage awards for emotional distress caused by city's union busting activities)). Defendants themselves include the cites to these non-housing cases in their legal arguments. (Defs.' Mem. of Law at 42–44). Furthermore, courts have recognized that even a single instance of discrimination can warrant significant emotional distress damage awards. *See Muldrew v. Anheuser–Busch, Inc.*, 728 F.2d 989 (8th Cir.1984) (upholding compensatory damage award of $125,000 for racially discriminatory discharge from job). In the instant case, the Broomes' ability to find alternative housing on short notice lessened their economic damages, but did not erase the emotional impact of the discrimination suffered. Available research supports this contention.[9]

9. Relatively little in-depth research exists con-

cerning the personal costs of discrimination and

Even if the court only reviewed awards granted in housing discrimination cases, such a review would not be determinative by itself. Generally, courts in this circuit regard awards in prior cases as instructive but not binding. *Martell v. Boardwalk Enterprises Inc.*, 748 F.2d 740, 750 (2d Cir.1984); *cf. Senko v. Fonda*, 53 A.D.2d 638, 384 N.Y.S.2d 849, 851 (2d Dep't 1976) (prior awards "may guide and enlighten the court[s]"). The court in *Martell* recognized that there are "difficulties inherent in comparing one personal injury award to another because differentiating facts in each case 'limit the precedential value of a court's treatment of awards in other apparently similar cases.'" *Martell*, 748 F.2d at 750 (citations omitted). Indeed, this difficulty requires courts to "accord substantial deference to the jury's determination of factual issues." *Wheatley v. Ford*, 679 F.2d 1037, 1039 (2d Cir.1982).

In the face of persistent housing discrimination which continues unabated some 30 years after Congress passed the Fair Housing Act to stamp out decades of such discriminatory behavior,[10] the genuine emotional pain associated with such discrimination should not be devalued by unreasonably low compensatory damage awards, especially when one considers the difficulty a plaintiff faces in establishing that he or she was a

victim of housing discrimination. After reviewing the awards given for emotional distress in comparable cases and the evidence adduced at trial, the court finds that the actual emotional and mental damages suffered by the Broomes were substantial and that the jury's compensatory award of $114,000 each for emotional damages is not excessive.

### 2. Demou's Award

The jury found the Beekman defendants liable to Demou on five separate claims and awarded her a total of $107,000 in compensatory damages for these claims: $100,000 for her two retaliation claims, $5,000 for her breach of contract claim, $1,000 for her breach of fiduciary claim, and $1,000 for her tortious interference with a contract claim. The Beekman defendants assert that Demou's award is excessive and, accordingly, seek a remittitur of her compensatory damages.

 The Beekman defendants contend that Demou's verdict should be remitted because the jury awarded her more than the $52,963 she claimed to have suffered in economic damages. (Defs.' Mem. of Law at 47). Demou argues that her $107,000 award was proper because she suffered emotional inju-

---

racial exclusion. However, that research which exists is illuminating. It connects the experience of discrimination to lower levels of life satisfaction and higher levels of stress and psychological suffering, including depression. *See* Joe R. Feagin, Kevin Early & Karyn D. McKinney, The Many Costs of Discrimination: The Case of Middle-Class African Americans 11 (Dec. 22, 1996) (unpublished manuscript on file with the sociology department at the University of Florida). Two authors, in particular, described the lasting impact of discrimination: "[i]n the immediate situation or over the long haul, discrimination can generate determination, embarrassment, frustration, bitterness, anger, rage, and any combination of these feelings. Discrimination is an energy-consuming, life-consuming experience." JOE R. FEAGIN & MELVIN P. SIKES, LIVING WITH RACISM: THE BLACK MIDDLE-CLASS EXPERIENCE, 23, (1994). *See also* A.KARDINER & L. OVESEY, THE MARK OF OPPRESSION, 302–3 (W.W. Norton 1951) ("[social discrimination] seems to be an ever-present and unrelieved irritant. Its influence is not alone due to the fact that it is painful in its intensity, but also because the individual, in order to maintain internal balance and to protect himself from being overwhelmed by it, must institute restitutive

maneuvers ... In addition to maintaining an internal balance, the individual must continue to maintain a social facade and some kind of adaptation to the offending stimuli so that he can preserve some social effectiveness."); ELLIS COSE, THE RAGE OF A PRIVILEGED CLASS. WHY ARE MIDDLE-CLASS BLACKS ANGRY? WHY SHOULD AMERICA CARE? (HarperCollins 1993) (chronicling the emotional stress experienced by black professionals who encounter discrimination despite credentials and hard work); NANCY KREIGER & STEPHEN SIDNEY, *Racial Discrimination and Blood Pressure: The CARDIA Study of Young Black and White Adults*, 86 AMERICAN JOURNAL OF PUBLIC HEALTH 1370 (October 1996), No. 10 (finding link between experiences with racial discrimination and higher blood pressure).

**10.** An Urban Institute housing study conducted as recently as 1989, found that 53% of black renters and 59% of black homebuyers could be expected to encounter one or more incidents of discrimination while looking for a home. *See* Margery Austin Turner, Raymond J. Struyk & John Yinger, HOUSING DISCRIMINATION STUDY: SYNTHESIS 1 (U.S. Government Printing Office 1991).

ries in addition to economic loss. (Demou's Mem. of Law at 17–18). The court finds, however, that the jury could not have properly awarded her damages for emotional distress because Demou only sought economic damages in this case. In her complaint, Demou requested "her actual damages for all unlawful and discriminatory acts of the Defendants, including but not limited to, lost rents, broker fees, maintenance expenses, expenses incurred in the continued maintenance and eventual sale of the Apartment, attorney's fees, and any other expenses that Mrs. Demou incurred as a direct result of the unlawful and discriminatory acts of the Defendants." (Third-party Answer, Defenses, and Counterclaims, at 25 ¶ G; *see id.* ¶¶ 117, 120, 123, 128, 133, 139). Demou's attorney told the jury that Demou only sought damages for her out-of-pocket expenses, and did not seek an award for emotional or mental anguish: "Mrs. Demou's damages are measured by out-of-pocket expenses.... It's not anguish ... not pain and suffering. It's nothing like that at all. It is out of pocket damages. These are her actual expenses, her actual injury." (Tr. at 1107). The court also instructed the jury to only consider Demou's actual expenses when determining her compensatory award. (*See* Jury Instructions, Tr. at 1175).

The Beekman defendants also argue that Demou's verdict was erroneous because the jury duplicated her damages by awarding her damages more than once for the same injury. (Defs.' Mem. of Law at 48). "[W]hen a plaintiff seeks compensation for the same damages under different legal theories of wrongdoing, the plaintiff should receive compensation for an item of damages only once." *See Gentile v. County of Suffolk,* 926 F.2d 142, 153 (2d Cir.1991). In particular, a single recovery should be allowed when the plaintiff's "theories of recovery were based on a single set of facts, and the economic loss sustained was predicated on those unitary facts." *Conway v. Icahn & Co., Inc.,* 16 F.3d 504, 511 (2d Cir.1994). Demou sought $52,963 in damages under the theories of retaliation, breach of contract, breach of fiduciary duty, and tortious interference with the performance of a contract. (*See* Third-party answer, defenses and counter-

claims ¶¶ 111–39). She claimed that these actual damages resulted from the Beekman defendants' treatment of her during the Broomes' application process, rejection of the Broomes' sublet application, issuance of a Notice of Default against her, and filing of lawsuits against her. (*See id.* ¶¶ 63, 64, 110). The court finds that Demou is only entitled to a maximum of $52,963 in recovery for these five causes of action because, according to Demou, this sum represents all the economic injuries she suffered because of the Beekman defendants' acts. (*See* Tr. at 1107).

The Beekman defendants maintain that Demou failed to prove that she incurred $52,963 in actual damages as a result of their actions toward her. (Defs.' Mem. of Law at 49–52). Demou's damages consisted of her out-of-pocket expenses associated with lost rental income, the Notice of Default, and the sale of her apartment. The Beekman defendants specifically argue that Demou failed to prove the economic damages she suffered from lost rental income and selling her apartment.

■■■ Demou claimed that she lost ten months of rental income for the period including June, 1995 through March, 1996 because the apartment remained vacant for this period and, had the Beekman defendants approved the Broomes' sublet application, she would have received rent payments for this term. The Beekman defendants assert that Demou did not prove any lost rental income for the months of June through October, 1995, because she told Gregory Broome that he did not have to pay rent for June, 1995 and made no effort to mitigate her damages during this period. (Defs.' Mem. of Law at 50). They also argue that Demou is not entitled to any lost rental income for the period beginning October, 1995 through April, 1996, because during this term she only tried to sell and not rent her apartment. (*Id.* at 51).

The trial evidence shows that Demou would have received rental income for three of the four weeks in June, 1995 because the Broomes contracted a two-year sublease with Demou starting on June 7, 1995. (*See* Residential Lease Agreement, at Aff. of Eric

Richardson, Exh. E). Given a monthly rent of $2,400, Demou would have received $1,800 for June, 1995, had the Broomes' sublet application been approved. (*See id.*). The record also indicates that Demou acted reasonably in her efforts to mitigate damages. *See Novelty Textile Mills, Inc. v. C.T. Eastern, Inc.*, 743 F.Supp. 212, 219 (S.D.N.Y.1990) (Newman, J.) ("Where mitigation of damages is at issue, the test applied to plaintiff's conduct is whether the action taken in response to the defendant's breach was reasonable."). At trial, Demou testified that she advertised the apartment and left her keys with George Xylas when she went away in July, 1995 so that brokers could show the apartment. (*See* Tr. at 790–92; 802–03). Demou also testified that she hired Carol Green, a broker, in October, 1995, to assist in either selling or renting the apartment. (*See* Tr. at 791). The evidence shows that Demou found a buyer for her apartment at the end of 1995, and closed on the apartment sale in April, 1996. (*See* Tr. at 797, 887). Thus, the court concludes that Demou was entitled to rent income for the period starting on June 7, 1995 through March, 1996 in the amount of $23,400.

Demou also claimed that she suffered $27,053 in damages for expenses she incurred in selling her apartment. (*See* Demou's Damages Exh., at Defs.' Notice of Motion, Exh. A). The Beekman defendants argue that this award was not proper because there is no evidence in the record to show that they caused or forced her to sell the apartment. (Defs.' Mem. of Law at 52). Demou asserts that this argument is without merit because "Board members testified that they wanted Mrs. Demou out of Beekman and that is why they finally lifted the Notice of Default." (Demou's Mem. of Law at 22). While this testimony demonstrates that the Beekman defendants wanted Demou to sell her shares, the court finds that it is not sufficient testimony to show that the Beekman defendants caused or forced Demou to sell her apartment. The Beekman defendants lifted the Notice of Default after Demou found a buyer for her apartment in December, 1995. (*See* Tr. at 886–87). Eddie Vega also testified that Demou talked about selling her apart-

ment before the Notice of Default was lifted. (*See* Tr. at 917).

■ Even if Demou could claim damages associated with the sale of her apartment, these expenses have to be offset by any profit she made through that sale. *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F.Supp. 486, 490 n. 13 (S.D.N.Y.1987) (Lasker, J.) (concluding that plaintiff's "damage calculations must account for the profits as well as the losses which it experienced as a result of defendants' ·. . . behavior."). The evidence shows that she made approximately $100,000 on the sale, which exceeds the $27,065 in damages that she claimed. (*See* Tr. at 801–02). Therefore, the court concludes that she was improperly awarded $27,065 in damages related to the sale of her apartment and, accordingly, that her compensatory damages must also be remitted by this amount. Overall, the court finds that Demou is entitled to $25,310 in compensatory damages.

### B. *Punitive Damages*

■ The jury awarded punitive damages in the amount of $410,000 to the Broomes and $57,000 to Demou. The Beekman defendants contend that these awards were inappropriate because neither the Broomes nor Demou established that their actions warranted the imposition of punitive damages. Punitive damages are appropriate where the defendants acted " 'wantonly or willfully or were motivated by ill will, malice, or a desire to injure the plaintiffs.' " *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 909 (2d Cir.1993) (quoting *Saunders v. General Servs. Corp.*, 659 F.Supp. 1042, 1061 (E.D.Va. 1987)). Based upon the evidence presented at trial, the court finds that the jury could properly determine that punitive damages were warranted in this case. The trial record contains proof from which the jury could find that the Beekman defendants acted willfully or maliciously when they rejected the Broomes' sublet application because of Gregory Broome's race and retaliated against Demou for trying to oppose the Board's actions. *See* Section II.A. & Subsection II.B.1., *supra*.

■ In the alternative, the Beekman defendants seek a remittitur of the punitive

damages awarded. In reviewing a punitive damage award, a court must " 'make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.' " *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir.1996) (citing *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir.1992)). The United States Supreme Court has created three guideposts to assist courts in determining the reasonableness of a punitive damage award: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of punitive damages to compensatory damages; and (3) a comparison of the punitive damages award to civil or criminal penalties that could be imposed for comparable misconduct. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573 – 585, 116 S.Ct. 1589, 1598– 1603, 134 L.Ed.2d 809 (1996). The Beekman defendants assert that the punitive damage awards were unreasonable when analyzed in accordance with these standards.

Examining the three *Gore* factors together, the court finds that substantial punitive damages were warranted in this case. First, the Beekman defendants' conduct toward the Broomes and Demou was highly reprehensible. The record contains evidence from which the jury could find that the Beekman defendants acted willingly or maliciously when they discriminated against the plaintiffs on the basis of their race, and retaliated against Demou for trying to oppose the Board's actions. *See* Section II.A. & Subsection II.B.1., *supra.* The trial testimony also indicates that their behavior inflicted emotional harm upon the Broomes. *See* Subsection IV.A.1., *supra.* Second, the ratio of punitive to compensatory damages is proportionate in this case. The United States Supreme Court has held that a punitive damage award of "more than 4 times the amount of compensatory damages ... does not cross the line into the area of constitutional impropriety." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24, 111 S.Ct.

1032, 113 L.Ed.2d 1 (1991). The awards in the instant case do not exceed that ratio: the Broomes' $410,000 award is almost 2 times the amount of their $230,000 compensatory damage award, and Demou's $57,000 award is approximately 2 times the amount of her $25,310 compensatory damage award. The punitive damages in this suit are also not disproportionately excessive because they have been awarded against several, and not just one, defendants—five Board members and a corporation.[11] Third, the punitive damage awards are reasonable when compared with the penalties that could be imposed for the conduct at issue. Under the Federal Fair Housing Act, 42 U.S.C. § 3613(c); and 42 U.S.C. §§ 1981 and 1982, there is no limitation on the amount of punitive damages that may be awarded for such conduct. Therefore, based on all these considerations, the court concludes that the Broomes' and Demou's respective punitive damage awards are not excessive, and must stand.

### V. Conclusion

The Beekman defendants' motions for judgment as a matter of law, under Rule 50, F.R. Civ. P., for a new trial, pursuant to Rule 59, F.R. Civ. P., and for a remittitur of the punitive damages awarded to the Broomes and Demou are denied in all respects, as is the motion for a remittitur of the compensatory damages awarded to the Broomes. The motion for remittitur of compensatory damages to Demou is granted and such damages are reduced to $25,310. Demou has the option of accepting the reduced award or having a new trial on the issue of compensatory damages.

**IT IS SO ORDERED.**

---

**11.** The Beekman defendants argue that the jury erred when it awarded punitive damages against both the Board members, in their official capacities, and the corporation. (Defs.' Mem. of Law, at 34 n. 8). As plaintiffs have shown, however, courts have awarded punitive damages against both a corporation and its officers before. *See, e.g., Swersky v. Dreyer and Traub*, 219 A.D.2d 321, 643 N.Y.S.2d 33, 38 (N.Y.App.Div.1996) (holding that "the firm may be held liable to the same extent as the individual defendant").