**Donna PARRIS, Plaintiff,**

v.

**Charles PAPPAS, et al., Defendants.**

**No. 3:10cv1128 (WWE).**

United States District Court, D. Connecticut.

Feb. 2, 2012.

Ben M. Krowicki, Christopher M. Wasil, Bingham McCutchen, Michael J. Coolican, Bracewell & Giuliani, LLP, Greg J. Kir-schner, Timothy Bennett–Smyth, Hartford, CT, for Plaintiff.

Donn A. Swift, Lynch, Traub, Keefe & Errante, New Haven, CT, for Defendants.

## ORDER

WARREN W. EGINTON, Senior District Judge.

Upon de novo review and over objection, the Court hereby approves and adopts Magistrate Judge Fitzsimmons's recommended ruling on damages [doc. # 112].

The clerk is instructed to enter judgment in plaintiff's favor awarding $112,407 in compensatory damages and $150,000 in punitive damages for a total award of $262,407. Plaintiff may file a bill of costs within ten days after entry of judgment.

The clerk is instructed to close this case.

## RECOMMENDED RULING ON DAMAGES

HOLLY B. FITZSIMMONS, United States Magistrate Judge.

On December 2, 2010, the Hon. Warren W. Eginton, D.J. entered a default judgment against defendants and referred this matter to the undersigned for a recommended ruling on damages.[1] A hearing on damages was held on March 24 and April 14, 2011.[2] [Doc. ## 57, 63]. Plaintiff seeks an award of compensatory and punitive damages in the amount of $412,407 [Doc. # 71], attorneys' fees in the amount of $109,942.50 [Doc. ## 72, 80] and costs totaling $522,349.50.[3]

---

1. All well-pleaded allegations of plaintiff's complaint are accepted as true for purposes of ruling on a motion for default judgment, except as to their alleged damages. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir.1999); *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir.1997).

2. The Court considered the Complaint [Doc. # 1], plaintiff and defendants' post-trial briefs [Doc. ## 71, 69 respectively], reply briefs [Doc. ## 79, 78] (respectively) and the hearing exhibits and transcripts [Doc. ## 59, 62, 57, 63 (respectively)]. Also considered was plaintiff's Notice of Supplemental Authority dated August 5, 2011. [Doc. # 88].

3. Plaintiff will file a bill of costs within ten (10) days after entry of judgment. D. Conn. L. Civ. R. 54(a)(1). [Doc. # 72–1 at 3].

## Procedural History

Donna Parris filed this civil rights action for declaratory and injunctive relief and damages on July 20, 2010, alleging violation of the Fair Housing Amendments Act, 42 U.S.C. § 3601, *et seq.;* violation of Connecticut's Discriminatory Practices Act, Conn. Gen.Stat. § 46a–64c; Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; and violation of the Connecticut Unfair Trade Practices Act, ("CUTPA"), Conn. Gen.Stat. § 42–110b, *et seq.* [Doc. # 1].

Plaintiff is a resident at 6 Normandies Park Road, Dayville, CT. Normandies Park is a mobile home park. The defendants are Normandies Park LLC, owner of Normandies Park since April 8, 2010; Charles Pappas, member of Normandies Park, LLC; Anna Alexis LLC, owner of Normandies Park from at least December 2005 through April 8, 2010; and Robin Delaney, manager of Normandies Park and a member of Anna Alexis, LLC. [Doc. # 1 ¶¶ 4–7].

The Court granted default judgment in favor of plaintiff on December 2, 2010, and granted a motion for preliminary injunction on December 14, 2010, 2010 WL 5157326. [Doc. ## 17, 26]. The Court enjoined the defendant mobile home park owners Charles Pappas, Robin Delaney, Anna Alexis, LLC and Normandies Park, LLC, to allow plaintiff the reasonable accommodation for her disabilities of having a 24 hour live-in aide; prohibited defendants from retaliating against plaintiff; and ordered Normandies Park, LLC to cease its retaliatory eviction proceeding against plaintiff. [Doc. # 26].

Counsel for defendants filed an appearance on December 13, 2010, [Doc. # 25], and defendants filed a Motion to Reopen on December 16, 2010. [Doc. # 27]. The Court denied defendants' Motion to Reopen on February 23, 2011. [Doc. # 44].

## Legal Standard

"[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability," but it "is not considered an admission of damages." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992). "While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." *Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974). Plaintiff must establish the damages "in an evidentiary proceeding in which the defendant has the opportunity to contest the amount." *Greyhound Exhibitgroup,* 973 F.2d at 158; *see also Overcash v. United Abstract Group, Inc.,* 549 F.Supp.2d 193, 196 (N.D.N.Y.2008) ("[E]ven upon default, a court may not rubber-stamp the non-defaulting party's damages calculation, but rather must ensure that there is a basis for the damages that are sought."). "The burden is on the plaintiff to establish its entitlement to recovery." *Bravado Int'l Group Merch. Servs. v. Ninna, Inc.,* 655 F.Supp.2d 177, 189 (E.D.N.Y.2009); *see also Greyhound Exhibitgroup,* 973 F.2d at 158, 160.

The following facts are accepted as true for purposes of establishing liability.

Plaintiff purchased a mobile home from Anna Alexis, LLC on November 5, 2006 for $72,000 and entered into a rental agreement dated July 1, 2008 for lot # 6 at Normandies Park. [Doc. # 1, ¶¶ 8–9]. The rental agreement provides that the park owner, Anna Alexis, LLC, shall maintain all electrical, plumbing, gas, or other utilities provided in good working condition. *Id.* During an emergency situation, repairs must be made within 72 hours and the park owner must maintain all water and sewer lines and connections. *Id.*

Plaintiff is a person with a disability. She has been diagnosed with diabetes mellitus, retinopathy with bilateral macular edema, generalized sensory-motor polyneuropathy, bilateral ulnar neuropath[y], and orthostatic hypotension. *Id.* ¶¶ 10–12. Beginning in February 2009, John Dembowski moved into her home to provide 24–hour live-in care. *Id.* ¶ 13. Defendant Robin Delaney had both actual and constructive knowledge of plaintiff's live-in aide since February 2009. *Id.* ¶ 14.

In March 2009, plaintiff began to experience problems with her septic tank, including sewage back up into the toilets, failure of the leaching mechanism causing sewage to surface underneath her home and into the yard, unbearable stench in and around her home, and destruction to property stored under her home. *Id.* ¶ 15. The septic system required servicing in March 2009, July 2009, twice in October 2009, once in November 2009, once during winter 2009–10, on March 18, 2010, and two additional times since March 2010. *Id.* ¶ 16. In an effort to remediate the septic problems, plaintiff contacted the Town of Killingly in October 2009 and March 2010 and the Connecticut Department of Consumer Protection. *Id.* ¶ 19. The Town of Killingly notified the Northeast Division Department of Public Health on plaintiff's behalf. *Id.*

On at least three occasions, defendants attempted to shift the burden of maintaining the water and septic system from the owner of the park to the tenant.

-Defendants sent plaintiff and other tenants of Normandies Park a lease agreement dated July 1, 2009, attempting to transfer the responsibility for maintaining water and septic from the park owner to the tenant. *Id.* ¶ 21. Plaintiff refused to sign the Proposed Rental Agreement. *Id.* ¶ 22.

-By letter dated November 2, 2009, defendants through their attorney, Thomas Lonardo, notified plaintiff that she was in violation of her lease and rules and regulations of the Park for "1. Permitting an unauthorized person to reside in her mobile home; and (2) constructing an unapproved shed on [her] lot." [Def. Ex. 517]. "Unless the above violations(s) is/are corrected within 30 days of receipt of this letter we must immediately thereafter institute a Summary Process Action to have you removed from the Park." *Id.*

-On March 23, 2010, defendants' attorney contacted plaintiff and issued an ultimatum: if plaintiff agreed to pay $300 every time the septic tank required servicing, she would be allowed to have a 24 hour live-in aide; if she did not agree, she could not have a live-in aide and would be evicted. During this telephone call, defendants' attorney stated he did not believe Ms. Parris' disabilities required a 24 hour live-in aide. Compl. ¶ 34.

-On March 24, 2010, Anna Alexis LLC served plaintiff with a Notice to Quit, alleging that she had an unauthorized tenant and an unauthorized shed on the property. ¶¶ 36–37.

-On June 17, 2010, Alexis, LLC served Plaintiff with a Summary Process Complaint. *Id.* ¶¶ 36–37.

*DAMAGES CALCULATION*

A default constitutes an admission of all well-pleaded factual allegations in the complaint, except for those relating to damages. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir.1992); *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir. 1981). A default also effectively constitutes an admission that damages were proximately caused by the defaulting party's conduct; that is, the acts pleaded in a complaint violated the laws upon which a

claim is based and caused injuries as alleged. *Greyhound*, 973 F.2d at 159. The only question remaining, then, is whether plaintiff has provided adequate support for the relief she seeks. *Greyhound*, 973 F.2d at 158. The moving party need prove "only that the compensation sought relates to the damages that naturally flow from the injuries pleaded." *Id.* at 159.

Here the allegations of plaintiff's complaint, taken as true, establish a violation of the Fair Housing Act 42 U.S.C. § 3601, *et seq.* ("FHA"), as alleged in Count One; a violation of the Connecticut Discriminatory Housing Practices Act, Conn. Gen. Stat. § 46a–64c, as alleged in Count Two; breach of contract, as alleged in Count Three; breach of the implied covenant of good faith and fair dealing, as alleged in Count Four; and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42–110b, *et seq.* ("CUTPA"), as alleged in Count 5.

### 1. *Count One: Fair Housing Act Violation*

Ms. Parris seeks at least $100,000 in compensatory damages and at least $150,000 in punitive damages, plus attorneys' fees and costs, for the violation of her civil rights protected by the FHA.[4]

*Compensatory Damages*

Plaintiff bases her claim for compensatory damages on the duration of the discrimination, fear and anxiety associated with possibly losing her medically necessary live-in aide, the fear and anxiety associated with the eviction, and the physical pain and suffering resulting from defendants' conduct. [Doc. # 71 at 6–7].

*Duration of the discriminatory conduct*

Plaintiff seeks damages from November 2009 to the present, stating "to this day, [defendants] have never granted [her] reasonable accommodation request that they allow Mr. Dembowski to live in her home as a live-in aide." [Doc. # 71 at 7]. The Court finds plaintiff has established the duration of the discrimination as alleged in the complaint.

*Ms. Parris' Mental and Physical Distress*

▮ The Court finds that Ms. Parris suffered significant emotional and physical distress arising from defendants' actions. Specifically, plaintiff experienced fear and anxiety at the prospect of losing her live-in aide and the loss of her home through eviction proceedings initiated by defendants. [Compl. ¶¶ 10–13, 36]. Plaintiff's medical conditions are severe and the services provided by her live-in aide are necessary. [Pl. Ex. 1, Compl. ¶ 30]. Among other things, loss of her live-in aide would prevent Ms. Parris from taking her insulin shots, properly dressing herself, cooking in her home, noticing if she injured herself, making emergency phone calls and generally monitoring her medical condition. Compl. ¶¶ 11–13, 30.

Plaintiff testified credibly, based on her dealings with Attorney Lonardo, that she feared she would lose her home to eviction.[5] The evidence establishes that there

---

**4.** Plaintiff states that her damages for violation of the Connecticut Discriminatory Housing Act, Conn. Gen.Stat. § 46a–64c, in Count Two, "are the same and concurrent with damages sought under Count One." [Doc. # 71 at 31].

**5.** Ms. Parris testified that after she received the November 2009 letter from Attorney Lonardo threatening eviction, that she "had a lot of anxiety, a lot of stress, depressed. I was scared. I was expecting to come home from work one day and find chains on my front door. I'm afraid that I was gonna lose my house, my life savings, and I didn't have any place to go, and I didn't know where to turn to for help." [Doc. # 57 125:20–25]. She testified that she was frightened and experienced anxiety attacks, depression, crying and insomnia. [Doc. # 57 129:25–130:6; 131:9].

was a real and imminent threat that she could lose her home. [Notice to Quit March 24, 2010; a Summary Process Complaint June 17, 2010; and amended Summary Process Complaint August 3, 2010]. The testimony established that plaintiff was treated for anxiety, depression and insomnia caused by defendants' acts and that her medical conditions were exacerbated as a result. [Pl. Ex. 2, 3; Doc. # 57 28:22–29:3].

Finally, it is clearly established that plaintiff suffered emotional and physical distress due to the pervasive and repetitive septic problems, the intense smell associated with the presence of raw sewage and defendants' actions in response to plaintiff's complaints.[6] *See Iowa v. Landis,* N.10–1750, 2011 WL 2694717, *2–3 (Iowa App.Ct. July 13, 2011) (upholding lower court finding that "every human being has personal experience and observations of fecal material and I think that, as a result, every human being who is of competent mind can offer a lay opinion as to whether a substance is feces or not" and holding "[l]ay opinions based on personal observation are permissible."). The septic system required servicing in March 2009, July 2009, twice in October 2009, once in November 2009, once more during the 2009–10 winter, on or about March 18, 2010 and two additional times since March 2010. [Compl. ¶ 16]. Plaintiff testified that the odor made her violently ill and caused vomiting that affected her blood sugar levels, blood pressure and hydration and bruised her chest.[7] [Doc. # 57 138:3–139:12]. She also testified that the septic issues contributed to her stress, anxiety, and insomnia. [Doc. # 57 140:6–141:7]. Additionally, when the septic system backed up into her sinks and bathtub, she was unable to use the sinks or bathroom, cook, clean or use the washing machine and dishwasher. Plaintiff testified that she stayed in a hotel room on three occasions at a cost of approximately $85 per night because her home was not habitable. In order to prevent further septic issues, plaintiff stopped using her dishwasher and washing machine thereby incurring expenses to purchase paper products and disposable pans and weekly trips to the Laundromat. [Doc. # 57 141:18–25; 143:3–12; 146:14]. Ms. Parris also testified that items with an estimated value of $800 that were stored below her house had to be thrown away because of the septic system overflow. [Doc. # 57 145:1–15]. Finally, Ms. Parris testified credibly that the septic problem has detrimentally impacted her enjoyment of her home and yard. [Doc. # 57 149–150:1].

The Court finds that damages in the amount of $100,000 will reasonably compensate plaintiff for (1) defendants' failing to accommodate her disability; (2) threatening to evict her because she had a 24–hour live-in care provider; (3) attempting to use plaintiff's request for a reasonable accommodation as leverage to coerce a new lease agreement requiring to pay for sewage repairs; and (4) filing a notice to quit on March 24, 2010, a Summary Process Complaint on June 17, 2010 and an amended Summary Process Complaint on August 3, 2010. Beginning with the threatened eviction in November 2009, the eviction proceeded for more than a year

6. The facts alleged in the complaint were as follows: Since at least March 2009, plaintiff began to experience problems with her septic tank. The problems include: (1) sewage back up into the toilets in her home; (2) failure of the leaching mechanism, causing sewage to rise to the surface underneath Ms. Parris' home and in her yard; (3) unbearable stench in and around the house; and (4) destruction of her property which is stored beneath the home. [Compl. ¶ 15].

7. Plaintiff testified that she had quadruple bypass surgery and when she vomits "it feels like my chest is actually being torn apart again." [Doc. # 57 140:9–11].

and was only withdrawn after the Court's December 14, 2010 ruling, granting a preliminary injunction that "Normandies Park, LLC shall cease its retaliatory eviction proceeding against plaintiff." [Doc. # 26 at 4]. The Court finds that plaintiff has provided adequate support for the compensatory relief she seeks. *Greyhound*, 973 F.2d at 158.

In fashioning an appropriate compensatory award, the Court also considered the testimony of Ellen Mary St. Jean, a realtor with Exit Hometown Properties in Putnam, Connecticut. She testified that she represented Ms. Parris as her agent when plaintiff purchased her mobile home in 2006. Ms. Parris contacted Ms. St. Jean in March 2010 about selling her mobile home. Ms. St. Jean testified that she advised plaintiff against selling because her home would not sell with the current septic issues and a financing company would refuse financing on that basis. [Doc. # 57 105:10–106:13]. Ms. St. Jean testified it would not be cost effective for Ms. Parris to move her home to another park. [Doc. # 57 109:7]. She explained that because plaintiff owns a double wide mobile home, it would have to be taken apart before it could be moved. [Doc. # 57 at 118:1–21]. Ms. St. Jean estimated that it would cost approximately $10,000 to move the house after it was deconstructed, and reconstructed at a new site.[Doc. # 57 at 118:1–21]. She did not know if there were any lots in the area available to accommodate a double wide mobile home. [Doc. # 57 117:19–118:21]. Ms. Parris purchased her new mobile home in 2006 for $74,000.[8] [Doc. # 57 117:7].

 The Court has carefully considered the cases cited by plaintiff in fashioning an appropriate compensatory damages award for violation of her FHA rights.

This Court is guided by the following framework:

> Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: garden-variety, significant and egregious. In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration. Garden variety emotional distress claims generally merit $30,000 to $125,000 awards.
>
> Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses. Finally, egregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff. In significant or egregious cases, where there is typically evidence of debilitating and permanent alterations in lifestyle, larger damage awards may be warranted.

*Thorsen v. County of Nassau*, 722 F.Supp.2d 277, 292 (E.D.N.Y.2010) (quoting *Olsen v. County of Nassau*, 615 F.Supp.2d 35, 46–47 (E.D.N.Y.2009) (internal citations and quotation marks omitted)).

Based on the testimony and evidence, plaintiff's emotional and physical distress

---

**8.** Ms. Parris testified that she paid $72,000 in 2006 to purchase her mobile home. [Doc. # 57 123:15].

damages are properly categorized as at least significant rather than merely garden-variety.[9] The credible testimony of physician Carol Levitt, live-in aide John Dembowski and plaintiff provided contemporaneous proof of the physical and mental pain suffered by plaintiff. *Miner v. City of Glens Falls,* 999 F.2d 655, 662 (2d Cir. 1993). Plaintiff has established an objective correlation between events to which she testified and their physical and mental effects on her. Plaintiff's proof included contemporaneous treatment records from her physician and testimony from her physician, Dr. Carol Levitt, and live-in aide, John Dembowski. Mr. Dembowski testified that, with the commencement of eviction proceedings, plaintiff suffered anxiety, insomnia, crying spells and depression. [Doc. # 63 at 6:13–9:23]. He testified that plaintiff suffered physical distress from the stench associated with the sewage spills, including "violent vomiting" and chest pains, as well as exacerbation of her depression, anxiety and insomnia. [Doc. # 63 at 9:24–12:21]. Dr. Levitt testified that she prescribed Zofran to treat nausea and vomiting associated with the septic spills, Ambien for insomnia, and Xanax and Trazodone to assist plaintiff in managing her anxiety and depression over her "incredibly difficult living situation." [Doc. # 57 at 27:20–28:25; 31:13–32:23]. Significantly, Dr. Levitt's contemporaneous records of plaintiff's subjective complaints further corroborate plaintiff's testimony. The Court finds that the plaintiff in this case is credible and the evidence presented was persuasive.

The Court finds that an award of $100,000 will fairly compensate plaintiff. *See Broome v. Biondi,* 17 F.Supp.2d 211, 223 (S.D.N.Y.1997)(upholding an emotional distress award of $228,000 in an FHA racial discrimination case where a married couple was denied an apartment); *119–121 E. 97th St. Corp. v. New York City Comm'n on Human Rights,* 220 A.D.2d 79, 81, 642 N.Y.S.2d 638 (N.Y.App.Div.1996) (affirming $100,000 compensatory damages award for emotional distress caused by a FHA violation for discrimination on the basis of sexual orientation and disability over an 18 month period). The Court also reviewed consent decrees in FHA disability discrimination cases. *United States & Harry Tyus v. Fairway Trails Ltd.,* 5:06–cv–12087–JCO–VMM, doc. # 17 (E.D.Mich.S.D. Jan. 18, 2007) (alleging defendants retaliated against complainant for asserting his FHA rights. "Specifically, the complaint alleged that defendants retaliated against complainant when, two days after a state court ruling in an eviction proceeding that defendants had to accommodate the complainant's disability ... they sent him a letter stating that his lease would not be renewed." Consent decree requires defendants to pay the complainant $50,000 in damages along with training and reporting requirements)[10]; *United States v. Ashford Housing Auth.,* Civ. No. 1:07CV323–WKW, Doc. # 14 (M.D.Ala. Sept. 18, 2007) (alleging FHA violation when defendants unlawfully evicted a

---

**9.** Where an emotional distress claim "is devoid of any medical treatment or physical manifestation, it is considered to be 'garden variety.'" *Gatti v. Cmty. Action Agency of Greene County, Inc.,* 263 F.Supp.2d 496, 512 (N.D.N.Y.2003) (The range of a garden variety claim "appears to be as low as $5,000 to a relative high of $125,000"); *Olsen v. County of Nassau,* 615 F.Supp.2d 35, 46 (E.D.N.Y. 2009) ("Garden variety emotional distress claims generally merit $50,000 to $125,000 awards.") (internal citation and quotation marks omitted). As set forth above, plaintiff has demonstrated that she received medical treatment and suffered both emotional and physical distress.

**10.** Consent decree available at http://www.justice.gov/crt/about/hce/documents/fairway trailsettle.php

physically and mentally disabled tenant. Consent decree requires defendants to pay $45,000 in compensatory damages and includes injunctive relief);[11] *United States v. Gainesville Housing Auth.*, Civ. No. 1:05CV193 (N.D.Fla. Jan. 10, 2007) (alleging FHA violation on the basis of disability by refusing to grant reasonable accommodation requests of a husband and wife. Consent decree entered paying $50,000 in compensatory damages and provided other injunctive relief.)[12]; *Trujillo v. Bd. of Dir. of Triumvera Tower Condo. Ass'n*, No. 04–1933 (N.D.Ill. Sept. 8, 2004) (condominium association prohibited wheelchair-bound residents use of the front entrance). Consent decree provided complainants $70,000 in compensatory damages, plus injunctive relief, costs and fees, civil penalties and other equitable remedies[13]; *United States v. San Miguel 1 Homeowners Assoc.*, No. 02cv0161–IEG (JAH) (S.D.Cal. Feb. 26, 2003) (Homeowners Association "refused to install any type of emergency back-up system to ensure that people with disabilities would be able to exit the garage in the event of a power failure or other emergency that rendered the electric gate inoperable." Consent decree provided complainant $60,000 in compensatory damages plus injunctive relief)[14]; *see also California Dept. Of Fair Emp't & Housing v. 2001 California St. Apart.*, No. 03–423255 (Cal.Sup.Ct.2005), Vol. E1, Issue 1 *National Fair Housing Advocate* (Dec. 2005) (Reporting $1 million dollar settlement for denial of a reasonable accommodation under the fair housing act to provide accessible parking space after plaintiff developed a degenerative knee disorder).[15] The Court is mindful that "[i]n the face of persistent housing discrimination ... the genuine emotional pain associated with such discrimination should not be devalued by unreasonably low compensatory damage awards, especially when one considers the difficulty a plaintiff faces in establishing that he or she was a victim of housing discrimination." *Broome*, 17 F.Supp.2d at 226.

*Punitive Damages Under the FHA*

 Plaintiff seeks an award of punitive damages of at least $150,000 for defendants' violations of the FHA.

The FHA expressly provides for the recovery of punitive damages by plaintiffs who have suffered discriminatory housing practices. 42 U.S.C. § 3613(c)(1). Punitive damages are limited to cases in which the defendant has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual. Malice and reckless indifference refer to the defendant's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination. A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence

---

11. Consent decree available at http://www.justice.gov/crt/about/hce/documents/ashford settle.php

12. Consent decree available at http://www.justice.gov/crt/about/hce/documents/gainesvillesettle.php

13. Consent decree available at http://www.justice.gov/crt/about/hce/documents/triumvera settle.php

14. Consent decree available at http://www.justice.gov/crt/about/hce/documents/sanmiguelsettle.php

15. Summary of the consent decree available at http//www.fairhousing.com/include/media/pdf/1205.pdf.

supporting an inference of the requisite evil motive.

*United States v. Space Hunters, Inc.,* 429 F.3d 416, 427 (2d Cir.2005) (internal quotation marks and citations omitted) (on remand jury awarded $150,000 in punitive damages).[16] "An award of punitive damages is not a matter of right but is within the discretion of the trier of the facts and will depend upon the degree of wanton and willful conduct of the defendant." *Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974).

Plaintiff argues that, "[n]ot only did the defendants know Ms. Parris' live-in aide was medically necessary, but they chose to use that information against her. One rarely sees a fair housing case where a reasonable accommodation is turned on its head and used as *the basis* for a retaliatory eviction. But that is exactly what the defendants did and it warrants punitive damages." [Doc. # 71 at 17 (emphasis in original) ]. Plaintiff relies on the following facts to support her request for punitive damages and her contention that defendants acted willfully, maliciously and with reckless indifference to her FHA rights.

-Defendants were aware of plaintiff's need for accommodations at least by December 7, 2009. [Compl. ¶ 30; Rul. on Motion to Reopen Doc. # 44 at 6 (Eginton, J) ].

-November 2, 2009 letter from defendants' attorney stated plaintiff was in violation of her lease for two reasons: (1) Mr. Dembowski was an "unautho-

rized tenant" and (2) there was an "unauthorized shed" on the property. Plaintiff informed Attorney Lonardo that Mr. Dembowski provided 24 hour live in care as a result of her disabilities and she requested any forms necessary to document the live-in aide's lawful tenancy as a reasonable accommodation for her disability or to obtain any authorization for the shed. No forms were provided or identified. [Compl. ¶¶ 27-29].

-Five days after plaintiff contacted the Town of Killingly about septic issues, in March 2010, defendants' attorney contacted plaintiff and issued an ultimatum: if plaintiff agreed to pay $300 every time the septic tank required servicing, she would be allowed to have a 24 hour live-in aide; if she did not agree, should could not have a live-in aide and would be evicted. [Compl. ¶¶ 30, 33, 34].

-Within days of her refusal to assume the park's financial responsibilities for the septic system, eviction proceedings, through defendants' attorney, were commenced.[17] [Compl. ¶¶ 33-36].

-"[D]efendants point to no effort to respond to plaintiff's need for accommodation and the record actually demonstrates that they attempted to evict her live-in aide." [Rul. on Motion to Reopen Doc. # 44 at 6 (Eginton, J) ].

-Defendants' attorney Thomas Lonardo testified that he received a copy of the complaint in this action in August 2010.[18] [Doc. # 63 at 32].

---

**16.** *See* Press Release from United States Attorneys Office (S.D.N.Y. Oct. 4, 2007) http://www.justice.gov/usao/nys/pressreleases/civilrights/spacehunterspr.pdf.

**17.** Defendants' attorney Thomas Lonardo testified that he had more than 30 years legal experience, specializing in real estate matters associated with mobile home parks. He estimated that since approximately 1999, mobile home issues comprised 80 percent of his practice and that he represented about 40 mobile home parks throughout Connecticut.

[Doc. # 63 at 22]. Attorney Lonardo is the attorney for the Manufactured Homes Association; he does collections, evictions and appellate work. *Id.* Attorney Lonardo is a diabetic and has direct knowledge of the pain and suffering diabetes can cause. [Doc. # 63 at 22, 27].

**18.** This action was commenced on July 20, 2010. [Doc. # 1]. Plaintiff subsequently served defendants with the Summons, Complaint and related materials and returns of Service on October 19 and 25, 2010. [Doc.

-Defendants denied Ms. Parris a reasonable accommodation and pursued eviction proceedings until December 14, 2010 when Judge Eginton entered the following preliminary injunction order: "(1) defendants shall allow plaintiff the reasonable accommodation of her disabilities of having a 24–hour live-in aide; (2) defendants are prohibited from retaliating against plaintiff; and (3) Normandies Park, LLC shall cease its retaliatory eviction proceeding against plaintiff." [Rul. on Prelim. Inj., Doc. # 26 at 4 (Eginton, J) ].

-Judge Eginton denied defendants' motion to reopen, finding that "defendants have willfully evaded participation in this action, her septic system continues to require service, and further delay enables defendants to dissipate assets." [Rul. on Motion to Reopen, Doc. # 44 at 7 (Eginton, J) ].

-Violation of the agreement not to dissipate assets.[Doc. ## 64, 65].

The Supreme Court in *BMW of North America v. Gore* identified three "guideposts" for determining whether a punitive damages award is excessive: 1) the degree of reprehensibility; 2) the disparity between the harm or potential harm and the punitive damages award; and 3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases. *Ziemba v. Armstrong*, 433 F.Supp.2d 248, 255 (D.Conn.2006) (citing *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

■■■ "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* (quoting *Gore*, 517 U.S. at 575, 116 S.Ct. 1589). To assess the degree of reprehensibility, the court must consider three "aggravating factors": "1) whether a defendant's conduct was violent or presented a threat of violence; 2) whether a defendant acted with malice as opposed to mere negligence; and 3) whether a defendant has engaged in repeated instances of misconduct." *Id.*

In examining the *Gore* factors, the Court finds that punitive damages are warranted here. First, defendants' conduct toward Ms. Parris was highly reprehensible. The record contains evidence that defendants acted willfully, maliciously and/or with reckless disregard for plaintiff's FHA rights when they failed to accommodate her disability. Particularly, there is evidence that after plaintiff provided proof of her medical disability, defendants continued eviction proceedings until they were ordered by the Court to withdraw the action. *See Space Hunters, Inc.*, 429 F.3d at 427 ("A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive.").

As set forth in this opinion, the evidence also indicates that defendants' actions inflicted emotional and physical harm to plaintiff. Moreover, despite a court-ordered agreement to refrain from dissipating assets, defendants have reduced the value of the disclosed properties by failing to pay taxes, listed some of the disclosed properties for sale and took steps to further encumber the property by incurring expenses for work by outside contractors whom they did not pay, resulting in mechanics liens.

## 10–13]. Default was entered on November 19 and Default Judgment was entered on December 2, 1010. [Doc. ## 15, 17].

Second, the ratio of punitive to compensatory damages is reasonable. Although the Supreme Court has "decline[d] ... to impose a bright-line ratio which a punitive damages award cannot exceed," *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), it has "referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." *Id.*, 538 U.S. at 425, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 581 and n. 33, 116 S.Ct. 1589). Punitive damages of $150,000 is one and one-half times the compensatory damages award. This is not an excessive disparity. *See Ziemba*, 433 F.Supp.2d 248 (jury awarded compensatory damages of $100,000 and punitive damages of $150,000); *Broome v. Biondi*, 17 F.Supp.2d 211, 229 (S.D.N.Y.1997) (FHA race discrimination case, finding appropriate punitive damages award that were almost two times the compensatory damages award). *See also United States v. Matusoff Rental Company*, Case No. 3:99CV626 WHR, Doc. #102 (S.D.Ohio Mar. 30, 2007)(Finding FHA discrimination on the basis of familial status and race and awarding to 26 plaintiffs $405,000 for compensatory damages (from $7,500 to $20,000 per victim) and $130,000 for punitive damages (from $5, 000 per victim)),[19] *aff'd*, 184 F.3d 924 (8th Cir.1999); *United States v. Royalwood Cooperative Apts., Inc.*, Case No. 03–CV–73034–DT, 2005 WL 2148404 (E.D.Mich. Feb. 18, 2005) (Jury found FHA discrimination on the basis of disabil-

ity, judgment entered in favor of plaintiffs in the amount of $14,209.60 in compensatory damages and $300,000 in punitive damages)[20]; *United States v. Veal*, Civil No. 02–0720–CV–W–DW (W.D.Mo. May 27, 2004) (awarded compensatory and punitive damages totaling $1,102,804 to eleven female tenants for FHA discrimination on the basis of sex compensatory damages awards ranged from $1 to $15,600 per victim and punitive damages awards ranged from $7,500 to $300,000 per victim)[21] *United States v. Big D Enter., Inc.*, 184 F.3d 924 (8th Cir.1999) (FHA discrimination on the basis of race, affirming jury award to prospective tenants of $1,000 in compensatory damages and $100,000 in punitive damages).

Third, the punitive damage award is reasonable compared with the penalties that could be imposed for the conduct at issue. Under the Federal Fair Housing Act, 42 U.S.C. § 3613[c], there is no limitation on the amount of punitive damages that may be awarded. Defendants were dealing with a tenant who had significant health issues and who was vulnerable emotionally and financially. The record reflects they tried to take advantage of her for their own financial benefit.,

Based on all these considerations, the Court awards plaintiff $150,000 in punitive damages.

### 2. *Count Five: CUTPA Violation*

Ms. Parris seeks $62,407 in compensatory damages and $100,000 in punitive damages, plus attorneys' fees and costs for violation of CUTPA.[22] The Court finds

---

**19.** Bench ruling is available at: http://www.justice.gov/crt/about/hce/documents/matusoff order—3–30–07.pdf

**20.** Judgement is available at: http://www.justice.gov/crt/about/hce/documents/royalwoodjudge.pdf

**21.** Judgment is available at: http://www.justice.gov/crt/about/hce/documents/vealjudgment.php

**22.** Plaintiff states that her damages for breach of contract (Count 3) and breach of the implied covenant of good faith and fair dealing "are the same and concurrent with damages

defendants' violation of CUTPA is established by default; however, CUTPA damages must be proven. As set forth above, a party's default is not considered an admission of damages. *Cablevision of S. Conn. Ltd. P'ship v. Smith,* 141 F.Supp.2d 277, 282 (D.Conn.2001); *Greyhound,* 973 F.2d at 158.

### Compensatory Damages

Ms. Parris seeks recovery of ascertainable losses in the amount of $12,407 and $50,000 for pain and suffering to compensate her for the CUTPA violation.

### Ascertainable Losses

Plaintiff seeks $12,407 in ascertainable losses, pursuant to Conn. Gen.Stat. § 42–110g as follows.[23]

| | |
|---|---|
| Rent Reimbursement<br> –during the period of septic issues<br> ($395/mo × 24 mo)[24] | $ 9,480 |
| Property Loss<br> –Camping Equipment | $ 800 |
| Hotel<br> –($89/night x 3 nights) | $ 255 |
| Loss of use of dishwasher<br> –disposable pans, dishes, utensils, glasses<br> ($12/wk x 78 weeks) | $ 936 |
| Loss of use of washing machine<br> –Laundromat ($12/wk × 78 wks)[25] | $ 936 |
| TOTAL | $12,407 |

■ The Court finds that plaintiff is entitled to recover the rent she paid during the period that she was discriminated against on the basis of her disability and while the septic issues were unresolved. Plaintiff has clearly established that she incurred a loss of occupancy value and suffered emotional and physical distress due to defendants' actions. *Conaway v. Prestia,* 191 Conn. 484, 493, 464 A.2d 847 (1983)(Supreme Court held that a landlord's violation of the standards of safety and habitability set forth in the landlord and tenant statutes offends public policy and amounts to an unfair act or practice in violation of CUTPA.) In the present case, the defendants' collection of rent while violating plaintiff's FHA rights, failing to resolve the septic issues in an effort to coerce a new rental agreement, and commencing eviction proceedings is unfair, offends public policy and caused injury to plaintiff. *See Hiraprashad v. Rebeiro,* 40 Conn. L. Rptr. 317, 2005 WL 3508326, *2 (Conn.Super.Ct. Nov. 22, 2005) (finding plaintiff alleged a claim under CUTPA where landlord continued to collect rent despite failure to keep common areas of the premises in safe condition); *Dominick v. Rivas,* No. CVNH–0803–13197, 2009 WL 1957630, *2–3 (Conn.Super.Ct. Mar. 5, 2009) (finding that CUTPA's remedial purposes are served by its applicability to single landlord-tenant transactions).

Plaintiff is also entitled to recover expenses incurred due to the septic system

sought under Count One." [Doc. # 71 at 31–32].

**23.** Subsection (a) of Conn. Gen.Stat. § 42–110g states, "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court may, in its discretion, award punitive damages and

may provide such equitable relief as it deems necessary or proper."

**24.** The Court finds that the duration of the septic issues, March 2009 to March 2011, is established.

**25.** This amount is exclusive of mileage to travel to the Laundromat. Plaintiff testified she made weekly trips to the Laundromat located a "couple of miles" from her home. [Doc. # 57 146:1]. She stated that at four miles round trip at the IRS mileage reimbursement rate in effect at the time ($.505), Ms. Parris suffered losses of $157.56 for 78 weekly trips to the laundry.

failures. Plaintiff testified that in order to prevent further septic overflow, she curtailed her use of water by washing her laundry off-site and not using her dishwasher for a period of eighteen months.[26] Plaintiff may also recover for the value of personal property stored under her home that was destroyed by the septic overflow.[27] The Court also awards hotel expenses incurred when the sewage was backing up into her tub and sinks, rendering her home unhealthy and uninhabitable.[28]

Accordingly, plaintiff may recover her ascertainable losses in the amount of $12,407.

### Compensation for Pain and Suffering

■ In addition to ascertainable losses, plaintiff is seeking $50,000 in compensatory damages for pain and suffering caused by the CUTPA violations. As set forth above, plaintiff has established that defendants' actions caused her both emotional and physical pain and suffering. Under CUTPA, Parris seeks damages for physical pain and suffering caused by defendants' failure to properly maintain the property because of the "on-going and disgusting septic issues." [Doc. # 71 22–24]. However, her recovery theory and the facts she relies on are coextensive with the compensatory damages already awarded for the FHA violation, including the nausea, medical treatment, anxiety, stress and pain associated with the sewage spills, as well as defendants' attempt to use plaintiff's request for a reasonable accommodation as leverage to coerce a new lease agreement requiring her to pay for septic system repairs. Thus, an additional compensatory award under CUTPA would amount to a double recovery. Accordingly, the Court declines to make a further compensatory damages award under CUTPA for emotional and physical pain and suffering.

### Punitive Damages under CUTPA

Plaintiff seeks an award of $100,000 in punitive damages for violation of CUTPA, arguing that this figure is "less than twice her compensatory damages."[29] [Doc. # 71 at 24]. Plaintiff has established that defendants acted willfully, maliciously and/or with reckless disregard. However, plaintiff's recovery theory and the facts she relies on are coextensive with the punitive damages already awarded for the FHA violation. An additional punitive damages award under CUTPA will amount to a double recovery. Thus, the Court declines to make an additional award of punitive damages under CUTPA.

### CONCLUSION

For the reasons stated, the Court recommends that the Court award to plaintiff of $112,407 in compensatory damages, and $150,000 in punitive damages, for a total damages award of $262,407.[30]

Plaintiff will file a bill of costs within ten (10) days after entry of judgment. D. Conn. L. Civ. R. 54(a)(1).

---

26. Plaintiff testified that weekly trips to the Laundromat cost $12 and that she purchased paper products and disposable pans at $12 per week to avoid using the dishwasher. [Doc. # 57 143:10–145:23].

27. Plaintiff testified that her camping equipment was valued at approximately $800. [Doc. # 57, 145:15].

28. Plaintiff testified she spent three nights in a hotel, at a cost of $85 per night, when the septic backup caused to her become violently ill. [Doc. # 57, 143:3–9; 146:14].

29. On page 30 of her motion plaintiff seeks $84,018 in punitive damages. [Doc. # 71 at 30].

30. Plaintiff also seeks a total of $109,942.50 in attorneys' fees. [**Doc. # 72, 80**]. The Court will address that request in a separate ruling.

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir.1989)(per curiam); *F.D.I.C. v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir.1995).

ENTERED at Bridgeport, this 4th day of January 2012.